[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10150

_____

RICKY J. JOHNSON,

Plaintiff-Appellant,

*versus*

DR. SHARON LEWIS,
Statewide Medical Director of Georgia Department of
Corrections,
DR. THOMAS FERRELL,
Medical Director of Ware State Prison
DR KEVIN MARLER,
Medical Director of Jenkins Correctional Facility,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:16-cv-00453-TES-MSH

———————————————

Before JORDAN, NEWSOM, Circuit Judges, and GRIMBERG,[*] District Judge.

GRIMBERG, Circuit Judge:

Ricky Johnson is an inmate in the custody and care of the Georgia Department of Corrections (GDC). Johnson was diagnosed with Hepatitis C (HCV) in 2009, but did not receive medication for it until nine years later. By then, Johnson's HCV had progressed to stage F4 cirrhosis with indications of severe liver inflammation. Johnson sued numerous prison doctors, three of whom are the subject of this appeal, alleging that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted summary judgment in favor of the doctors and dismissed all claims against them. Johnson appealed both the district court's grant of summary judgment and its denial of his motion to amend the complaint. Because we find that material disputes of fact remain as to the doctors' actions and inactions in treating Johnson, we reverse the

———————

[*] The Honorable Steven D. Grimberg, U.S. District Judge for the North-ern District of Georgia, sitting by designation.

district court's grant of summary judgment but affirm its denial of the motion to amend.

## I

The factual disputes in this case are manifold, and we construe the disputed matters in favor of Johnson, the nonmoving party. But before delving into the facts, some background on both HCV and the GDC's policy for treating it are in order.

HCV is a bloodborne virus that attacks a person's liver. In particular, it can cause liver scarring, or "fibrosis". Liver fibrosis is measured on a five-step scale, in ascending order of severity: F0 (no fibrosis); F1 (mild fibrosis); F2 (moderate fibrosis); F3 (severe fibrosis); F4 (cirrhosis). Cirrhosis is the most extreme form of liver damage, and can potentially result in liver cancer or liver failure. There are also grades of liver inflammation that can (but need not) correlate with the severity of the fibrosis. To monitor the progression of HCV infections, the standard of care is for doctors to use bloodwork to measure two enzymes, ALT and AST, that are released when the liver is damaged. While progression of the disease is often slow, it can also be unpredictable. It can take anywhere from months to decades to progress from one stage to the next. Irrespective of the progression rate, chronic HCV can be cured only with medication. It will not clear on its own.

The GDC has a policy for treating patients with HCV, which has and continues to evolve as new treatments and medicines become available. Because the relevant time period in this case spans from 2012-2018, two GDC policies are at issue: the 2012 policy and the 2016 policy. The 2012 policy provided for the

administration of a triple-drug treatment when patients met certain criteria, including a liver biopsy showing stage 2 fibrosis and grade 2 inflammation. The policy also provided for exceptions, stating that it was

> not intended to be a substitute for professional judgment by the managing physician, [gastrointestinal], or [infectious disease] consultant. Treatment is always to be individualized base[d] on any unique patient factors.

In other words, patients who did not meet the testing criteria could still qualify for treatment if approved by the managing physician or other professionals overseeing the patient's care.

In August 2016, the GDC updated its policy to account for the availability of newer, more effective treatments than the triple-drug regimen. The 2016 policy differed from the 2012 policy in a few relevant ways. First, it recognized a new class of HCV antiviral drugs. Second, it required the administration of a FibroSure test instead of a liver biopsy as part of a patient's treatment eligibility determination. Finally, it created three priority levels for treatment, with medication generally reserved for Priority 1 patients as determined by their FibroSure results.

With that background in mind, we turn now to Johnson's medical treatment or lack thereof. When Johnson was diagnosed

with HCV in 2009, he was serving his sentence at Wilcox State Prison and under the medical care of Dr. Charles Ruis, who is not a party to this appeal. At that time, the progression of Johnson's disease was mild and did not qualify him for treatment under either the GDC policy or the independent judgment of Dr. Ruis. Over the course of the next two years, Dr. Ruis continued to monitor Johnson's condition. In January 2012, Dr. Ruis referred Johnson to a gastroenterologist and HCV specialist, Dr. Ayaz Chaudhary, who is also not a party to this appeal. While it is unclear what exactly triggered Dr. Ruis's referral, he noted on the consultation request form that "[JOHNSON] HAS HCV AND WANTS TREATMENT" and "PLEASE CONSIDER FOR HCV TREATMENT."

On November 1, 2012, Dr. Chaudhary prescribed Johnson the triple-drug treatment and enrolled him in the prison's clinic for treatment of chronic diseases.[1] Dr. Chaudhary's decision to prescribe the triple-drug treatment is critical to the parties' dispute on summary judgment. They agree that, at the time Dr. Chaudhary wrote the prescription, Johnson's lab results did not qualify him for treatment under the 2012 policy. The parties do, however, dispute why Dr. Chaudhary issued the prescription anyway. Defendants cite Dr. Chaudhary's affidavit, which states that he prescribed the medication based on Johnson's perceived litigiousness, his advocacy for treatment, and out of an abundance

---

[1] The parties disagree about whether Dr. Chaudhary prescribed Johnson the treatment in November 2012 or April 2013, but because there is contradictory evidence on this point we construe all inferences in Johnson's favor for summary judgment purposes.

of caution. Johnson rightly points out that none of these reasons is noted in the contemporaneous documentation of Dr. Chaudhary's prescription. Johnson counters that the prescription was medically warranted and based on Dr. Chaudhary's professional judgment at the time, which is consistent with the 2012 policy. Regardless of the reason, Johnson did not receive his first dose until over five years later.

Johnson was transferred to Hays State Prison in December 2012, and in March 2013, to Ware State Prison and into the primary care of Defendant-Appellee Dr. Thomas Ferrell, the Medical Director at Ware. Dr. Ferrell is an internal medicine physician; while he is generally familiar with HCV, by his own admission he does not have the expertise to determine whether a particular patient should receive treatment for HCV.

Dr. Ferrell first saw Johnson on April 1, 2013. During that visit, Dr. Ferrell continued filling out Johnson's pre-therapy checklist, which Dr. Ruis started in 2009 and was required by the 2012 policy to be completed before a patient could begin receiving treatment. The checklist in turn required that a patient have current blood lab results before starting HCV treatment. Dr. Ferrell concluded that Johnson's blood labs from 2009 were aged and needed to be updated before Johnson could receive HCV treatment. So, Dr. Ferrell scheduled a follow-up appointment for Johnson with Dr. Chaudhary and ordered updated lab work.

According to Dr. Chaudhary, this follow-up occurred on April 25, 2013. During that appointment, Dr. Chaudhary again recommended that Johnson begin the triple-drug treatment for his

HCV. At that time Dr. Chaudhary discussed with Johnson that missing even a few doses of the medications could cause the treatment to fail. This was particularly relevant because Johnson was scheduled to temporarily relocate to a different prison within a few days of the April 25 appointment. According to Dr. Chaudhary, due to this impending relocation he and Johnson agreed to wait to begin the treatment until Johnson returned to Ware State Prison.

Johnson returned to Ware in August 2013. No treatment followed. This time, Dr. Ferrell attributed the delay to Johnson's upcoming hernia surgery, scheduled for October 2013. Dr. Ferrell's notes from September 16, 2013, state that "after surgery [HCV treatment] will be pursued." Johnson underwent hernia surgery on October 1, 2013, and returned from the hospital to Ware on October 8, 2013. He spent no time in the recovery unit and took no pain medication other than Tylenol. Nonetheless, Dr. Ferrell attributes Johnson's hernia surgery as the reason he did not begin receiving any HCV treatment for at least *eight* months.

Frustrated by the delay, Johnson filed a grievance complaint on May 9, 2014. According to the Ware Grievance Coordinator, Johnson's grievance complaint was denied because he "never discussed or inquired about treatment for Hepatitis." Johnson appealed, detailing the history of his HCV care. Defendant-Appellee Dr. Sharon Lewis, the GDC's Statewide Medical Director, denied Johnson's appeal on the ground that "medical personnel handled this case appropriately."

Even while his grievance complaint was pending, Johnson continued to seek medical care for his HCV. Following an appointment on May 28, 2014, Dr. Ferrell noted that Johnson was "ready to start [his prescription]" and scheduled another consult with Dr. Chaudhary. Another two months passed before this consultation occurred.

On July 31, 2014, Johnson finally saw Dr. Chaudhary but now, a new obstacle arose. Dr. Chaudhary explained to Johnson that the availability of newer, more effective HCV drugs was imminent. According to Dr. Chaudhary, both he and Johnson agreed that pursuing the triple-drug therapy he had prescribed in 2012 was no longer the best course of action. Johnson recalls this conversation but not any agreement on his part to delay treatment. Regardless, Dr. Chaudhary withdrew the outstanding prescription and recommended continued monitoring as well as a repeat liver biopsy to take place one year later, in July 2015.

Shortly before the date of the recommended repeat liver biopsy, on May 21, 2015, Johnson was transferred to Jenkins Correctional Facility, a CoreCivic privately-owned prison. This transfer also meant that Johnson was now out of Dr. Ferrell's care and into the care of Defendant-Appellee Dr. Kevin Marler, the Medical Director of Jenkins. Johnson saw Dr. Marler for the first time in early July 2015. At that time, Dr. Marler reviewed lab work and records for Johnson, and conducted a physical exam. Johnson's ALT reading was 119 and his AST reading was 64, both of which fell outside of the normal range. Nevertheless Dr. Marler contends that, while abnormal, these levels were to be expected for a patient

with HCV. Dr. Marler notified Johnson that he would be placed in Jenkins' chronic clinic, but would not receive drug therapy. Johnson informed Dr. Marler that he had already been prescribed HCV treatment and asked when it would begin. According to Johnson, Dr. Marler told him he would consult with GDC doctors about the treatment. Despite Johnson's follow-ups, Dr. Marler never reported hearing back from GDC.

Johnson continued to be monitored by Dr. Marler every six months, but the liver biopsy Dr. Chaudhary recommended to take place by July 2015 never occurred. Instead, during Johnson's first chronic care visit on January 4, 2016, he presented with a skin rash, including scattered lesions on his extremities, which were treated with hydrocortisone cream. During Johnson's second chronic care visit on June 28, 2016, blood work was done. While Johnson's ALT and AST scores are not noted, Dr. Marler indicated that the APRI score "did not indicate a level of liver involvement then requiring treatment."

Sometime in August 2016, the updated GDC HCV policy that required the FibroSure test came into effect. But Dr. Marler did not give Johnson a FibroSure test that year. It was Dr. Lewis who, in April 2017, reminded Dr. Marler that the GDC had added the test to its HCV protocol. The parties are not aware of what prompted this communication. It was not until June 11, 2017—at Johnson's next scheduled chronic care visit—that Dr. Marler finally administered a FibroSure test. Johnson's raw score was 0.91, indicating cirrhosis. His inflammatory markers also indicated severe inflammation.

The parties fervently dispute how Dr. Marler responded to these results. Johnson contends that for at least a month, the doctor did absolutely nothing. He avers that it was not until July 11 that Dr. Marler finally began Johnson's pre-therapy checklist and (retroactively) completed his notes from the June 11 appointment. On July 16, Dr. Marler ordered an abdominal ultrasound to determine whether the FibroSure test results were an accurate reflection of the severity of Johnson's HCV. Ultimately, the ultrasound neither confirmed nor dispelled the FibroSure test's indication of cirrhosis.

On the other hand Dr. Marler contends that, after receiving Johnson's FibroSure test results, he immediately ordered an offsite consult for HCV, noting that the results showed "stage F4 cirrhosis and needs prompt evaluation for treatment." In a July 2017 email, Dr. Marler wrote to Dr. Keith Ivens (CoreCivic's Chief Medical Officer), Dr. Lewis, and one additional doctor that Johnson's "pretreatment eval is nearly completed with only an abdominal [ultrasound] remaining, that has been scheduled." Dr. Marler asserted that he promptly submitted Johnson's case for completion of the evaluation process. However, Dr. Marler fails to explain why nothing happened between early August, when he received the results of Johnson's ultrasound, and November 2, when Johnson was transferred yet again, this time to Coffee Correctional Facility and out of Dr. Marler's care. Nor does Dr. Marler offer an explanation as to why Johnson was transferred to a new facility at this time.

According to Johnson, his transfer occurred under nefarious circumstances. Frustrated by the continued lack of treatment, Johnson filed a second grievance complaint on October 10, 2017. The grievance was denied, and two days later, citing an unexplained "Inmate on Staff Conflict," Johnson was transferred to Coffee. Johnson contends the transfer was in retaliation for filing the second grievance complaint.

Once at Coffee, which was another private facility overseen by CoreCivic, Dr. Guy Augustin took over Johnson's care. Dr. Augustin informed Johnson that he would attempt to start treatment. While the record lacks specific details about the circumstances, Johnson was again denied treatment in December 2017.

Johnson filed this suit in October 2016, which prompted CoreCivic's lawyers to get involved. In late January 2018, they asked Dr. Augustin to provide Johnson's treatment history. Dr. Augustin emailed a medical history summary to Dr. Lewis on January 29. A few hours later, she responded asking "WHO reviewed and refused treatment? What care has been provided since 2012?" Dr. Augustin then provided Dr. Lewis with a history of Johnson's detention facility transfers since 2012. The following morning, Dr. Ivens, CoreCivic's Chief Medical Officer, wrote to a three-member doctor team, stating that Dr. Lewis had "expressed concern about this case." He also noted that there was a "clear case" that Johnson be classified as a Priority 1 patient and to "make provisions for treatment ASAP." Johnson finally received his first dose of HCV treatment in mid-February 2018.

II

"We review a district court's grant of summary judgment *de novo*, applying the same legal standards applied by the district court." *Valley Drug Co. v. Geneva Pharms.*, 344 F.3d 1294, 1303 (11ᵗʰ Cir. 2003) (citing *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1242 (11ᵗʰ Cir. 2002)).

Johnson claims that Drs. Ferrell, Lewis, and Marler violated his Eighth Amendment right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has held that, because this amendment prohibits "the unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)), it also prohibits "deliberate indifference to serious medical needs of prisoners." *Id.* "Federal and state governments [ ] have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11ᵗʰ Cir. 2020) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11ᵗʰ Cir. 1991)). Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104. Deliberate indifference, however, is a "steep hill" for a plaintiff to climb. *Hoffer*, 973 F.3d at 1272.

Demonstrating deliberate indifference requires both an objective and subjective showing. *Id.* at 1270 (citing *Farrow v. West*,

320 F.3d 1235, 1243 (11th Cir. 2003)). A plaintiff must show that (1) he suffered from an "objectively serious medical need" and (2) a prison official acted with subjective deliberate indifference to that medical need. *Id.*; *see also Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). As to step one (the objective component), a medical need that is objectively serious "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326. As to step two (the subjective component), a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than gross negligence. *Wade v. McDade,* 67 F.4th 1363, 1366 (11th Cir. 2023).[2]

Applying this framework to each of the defendants here, we conclude that there are genuine disputes of material fact as to whether Drs. Ferrell, Lewis, and Marler were deliberately indifferent to Johnson's serious medical needs. The district court erred in granting summary judgment.

---

[2]    Our cases say both that the standard is "more than mere negligence" and that it is "more than gross negligence." *Compare, e.g., McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), with *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). Because there are issues of fact even under the "more than gross negligence" standard, we use that formulation here. *See Brooks v. Miller*, -- F4th --, 2023 WL 5355022 at *12 n.4 (11th Cir. Aug. 22, 2023).

III

We begin by acknowledging that the district court correctly found that the objective showing of deliberate indifference is satisfied with respect to each doctor. As this Circuit (and many others) have found—and as no party currently disputes—an HCV diagnosis is an objectively serious medical need. *Hoffer*, 973 F.3d at 1270. So, we move to the three-step subjective inquiry, considering each doctor individually.

### A.    Dr. Ferrell

Dr. Ferrell was responsible for Johnson's medical care during the twenty-six months he served at Ware State Prison. There is no dispute that Dr. Ferrell knew the risk of serious harm to Johnson given his HCV diagnosis, satisfying the first prong of the subjective inquiry. The dispute arises as to prongs two and three: whether Dr. Ferrell acted with more than gross negligence in disregarding that risk.

The primary issue here is Dr. Ferrell's decision not to administer the HCV treatment to Johnson notwithstanding Dr. Chaudhary's prescription. The effect of that decision turns on whether the prescription was medically necessary. Johnson relies on *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), in which this Circuit held that, "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." *Id. But cf. Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (holding that delaying

20-10150                Opinion of the Court                15

treatment for non-bleeding cuts and bruises was excusable because police needed to book the plaintiff into prison). While Dr. Chaudhary asserted that he prescribed Johnson's HCV treatment based on Johnson's litigiousness, his own medical advocacy, and out of an abundance of caution, Johnson correctly notes that these justifications were only provided post-lawsuit. No contemporaneous treatment documents or notes by Dr. Chaudhary reflect these justifications. And, even if these justifications are true, they do not necessarily negate a conclusion of medical necessity.

For his part, Johnson successfully rebuts the notion that Dr. Chaudhary's prescription was not medically necessary. He was sent to Dr. Chaudhary specifically for the purpose of determining whether he needed HCV treatment. At that time Johnson's liver biopsy showed grade 2 inflammation, which indicated his disease was progressing. There is sufficient evidence in the record to conclude that Dr. Chaudhary's prescription was both valid and medically necessary. Johnson also points out that Dr. Ferrell himself continuously confirmed to Johnson that he would receive treatment per Dr. Chaudhary's prescription.

There are genuine disputes of material fact as to whether Dr. Ferrell's reasons for delaying treatment were non-medical or even pretextual. First, Dr. Ferrell claims he delayed administration of treatment due to Johnson's temporary relocation to another prison, which Dr. Ferrell suggests could have disrupted the delivery of the medication. That is not necessarily true. The prescription (once Johnson finally received it) was easily

transferred to another prison during a short-term stay. Second, there is also a factual dispute about Dr. Ferrell's next claim, that the delay in the treatment administration was due to Johnson's hernia surgery. The record reveals that, following his hernia surgery on October 1, 2013, Johnson returned to Ware just eight days later, did not spend any time in the recovery unit, and took nothing more than Tylenol to manage his pain. It strains credulity to believe that Johnson's hernia surgery prevented him from receiving treatment for *eight months*.

Dr. Ferrell relies on *Hoffer*, 973 F.3d at 1268, to argue that the delay does not amount to deliberate indifference. *Hoffer* is inapplicable here. That case confronted whether the Hepatitis-C treatment policy of the Florida Department of Corrections violated the Eighth Amendment *per se*. This Circuit held that the policy—which required the Department of Corrections to monitor inmates with Stage 0 or Stage 1 HCV, rather than treat them with medication—did not amount to deliberate indifference. The facts here are well outside the bounds of *Hoffer:* Johnson had a valid, outstanding prescription for HCV treatment, which he was denied. If the question were simply whether the GDC's HCV treatment policy constituted a violation of the Eighth Amendment, *Hoffer* would control. But that is not the question presented here.

The district court also concluded that Dr. Chaudhary's prescription was not valid because he never completed the pre-therapy checklist required for treatment. Johnson argues that the prescription itself was valid and it was Dr. Ferrell's delay that prevented the checklist from being completed. Johnson contends

that this failure does not nullify the prescription, but is more evidence of improper delay in treatment. This, like those mentioned above, is a dispute of material fact. The district court erred in making inferences in favor of Dr. Ferrell. If Johnson's account of his treatment (or lack thereof) under Dr. Ferrell is true, a jury could find that the doctor's actions amounted to deliberate indifference by delaying and declining to administer Johnson's valid, outstanding HCV prescription without a valid justification.

### B.  Dr. Lewis

There are genuine disputes of material fact with respect to Dr. Lewis's conduct as well. The district court granted summary judgment on the ground that Johnson failed to show that Dr. Lewis had subjective knowledge of his HCV. But after months without treatment, Johnson submitted a grievance complaint detailing his condition and lack of treatment. The denial of Johnson's grievance bears Dr. Lewis's signature—a fact from which a jury could reasonably infer that she had knowledge of the contents of the form. *See Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019) (review and denial of prisoner's grievance appeals by director was evidence sufficient to establish a genuine issue of fact that director had knowledge of prisoner's HCV condition); *United States v. Gaines*, 690 F.2d 849, 855 (11th Cir. 1982) (holding that a jury could permissibly infer that an illiterate taxpayer's signature on his tax return was evidence that he knew of the false contents of the tax return). Despite her signature appearing on the denial form, Dr. Lewis swore in her affidavit that she had no actual knowledge of

Johnson's HCV. She avers that it is her regular practice to have staff review grievance forms, and her signature appears on the form simply by virtue of her role as the Statewide Medical Director.

Perhaps so. But, as Johnson points out, Dr. Lewis's say-so of having no actual knowledge of Johnson's condition notwithstanding her own signature on the grievance denial form turns entirely on her credibility. Credibility determinations are within the purview of the jury, not the district court. *See United States v. Grushko*, 50 F.4th 1, 11 (11th Cir. 2022). There exists a dispute of material fact as to whether Dr. Lewis actually or only by delegation concluded that "medical personnel handled [Johnson's HCV] case appropriately." The district court improperly credited Dr. Lewis's testimony that she had no knowledge of Johnson's HCV while ignoring the circumstantial evidence from which a jury could conclude that she did.

### C. Dr. Marler

Johnson takes issue with three delays in treatment while under Dr. Marler's care: the nearly two-year delay before performing a non-invasive FibroSure test instead of administering the liver biopsy Dr. Chaudhary had suggested; the two-month delay between Johnson's Stage 4 FibroSure test result and the ultrasound confirmation results; and a four-month delay between the ultrasound and Johnson leaving Dr. Marler's care in November 2017 without having received any treatment. There are genuine disputes of material fact regarding the delay at each stage. We take each in turn.

First, Johnson argues that Dr. Marler ignored Dr. Chaudhary's recommendation for a liver biopsy. In fact, Dr. Chaudhary's notes reveal something less than a recommendation per se; he notes that a repeat liver biopsy should be "considered" in one year's time. Instead of conducting a liver biopsy, Dr. Marler conducted routine check-ups, none of which, according to Marler, suggested Johnson's condition was rapidly progressing. Nonetheless, Dr. Marler admits that a biopsy is the most accurate measure of liver disease yet chose not to perform one, despite the fact that Johnson's ALT and AST scores were outside of the normal ranges from the moment he entered Dr. Marler's care. And, as Johnson points out, there is no evidence that Dr. Marler's decision *not* to perform a biopsy was based on his independent professional judgment. A jury could reasonably conclude that Dr. Marler's failure to conduct the biopsy, knowing full well the potential risk and that Johnson had elevated markers, amounts to something more than gross negligence.

The second alleged episodic delay in treatment arose on June 11, 2017, when Johnson received the FibroSure test and his results indicated severe progression of his HCV—F4 liver cirrhosis. After receiving these results, Johnson contends that Dr. Marler did nothing. Dr. Marler counters that he scheduled an ultrasound to confirm the results of the FibroSure test. But, there is no evidence that Dr. Marler did anything at all for 30 days to either pursue or rule out the need for treatment until he began a pre-therapy checklist on July 11, 2017. Drawing all inferences in favor of Johnson, Dr. Marler received Johnson's FibroSure test results

indicating sever liver cirrhosis and did nothing for nearly a month. A jury could very well conclude that his failure to promptly treat amounted to more than gross negligence.

Finally, on August 2, 2017, Johnson received the liver ultrasound that Dr. Marler scheduled. The results neither dispelled nor confirmed liver cirrhosis. At that point Dr. Marler admitted that "the degree of [Johnson's] liver cirrhosis was still unclear." And yet, there is evidence indicating Dr. Marler continued to do nothing. Johnson was abruptly transferred out of Dr. Marler's care to a different CoreCivic prison on November 2, 2017. Though Dr. Marler claims he submitted Johnson's case for treatment at some point (but could not provide a date or any documentation of such a referral), Johnson never received HCV treatment while under his care. A jury could well conclude that the lack of treatment Johnson received while under Dr. Marler's care reflects more than gross negligence.

***

The bar to proving an Eighth Amendment deliberate-indifference claim is certainly high, but it is not insurmountable. Johnson has raised a number of factual disputes regarding the denial of his HCV treatment for over eight years. These disputes are sufficiently material to be decided by a jury.

IV

Johnson appeals the district court's decision to deny his motion to amend the complaint. "We generally review the denial of a motion to amend a complaint for an abuse of discretion." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007) (citations omitted). Abuse of discretion is an extremely limited and highly deferential standard of review. It allows for a "zone of choice within which" the district court "may go either way." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 971 (8th Cir. 1984)).

Johnson, proceeding *pro se*, filed this case on October 12, 2016. His initial complaint raised § 1983 and ADA claims and named numerous defendants including Drs. Ferrell, Lewis, and Marler. On October 13, 2017, Johnson moved to amend his complaint to add several new defendants and allege new facts. Then, on December 22, 2017, before the magistrate judge had ruled on Johnson's motion to amend, an attorney named McNeill Stokes entered an appearance on Johnson's behalf and moved for a 30-day extension to respond to any outstanding motions and file a restated complaint. The magistrate judge granted Stokes's motion for an extension and allowed him to file a "restated complaint." Accordingly, she denied Johnson's motion to amend as moot.

On January 8, 2018, however, Stokes filed a motion to withdraw as Johnson's attorney because Johnson declined to sign a representation agreement. That motion was granted on January 9, 2018. Johnson was not served with the denial of his motion to

amend because, at the time of the denial, Stokes was still the attorney of record.

Johnson alleges that the court abused its discretion by denying as moot his motion to amend the complaint and, further, that it violated Fed. R. Civ. P. 77(d)(1) because it never served Johnson with a copy of the order, instead serving it on Stokes. Specifically, Johnson contends that his motion could not have been mooted by a legal filing from Stokes, who was neither a party nor counsel to anyone in the proceeding.

There is no doubt that reconsidering Johnson's motion to amend *sua sponte* might have been the more prudent course of action for a *pro se* plaintiff once Stokes withdrew as counsel. But, that is not the standard for determining whether the district court abused its discretion. And, while courts afford *pro se* plaintiffs some liberties not enjoyed by members of the bar, construing the abuse of discretion standard more liberally is not one of them. The magistrate judge did not abuse his discretion by denying the motion as moot nor by serving Stokes rather than Johnson with the order, as Stokes was in fact the attorney of record at the time of the denial. That Johnson had not yet signed a representation agreement -- a fact not known by the district court -- does not mean that an attorney-client relationship had not formed or that Stokes acted in bad faith by entering an appearance on Johnson's behalf at that time. Absent evidence that Stokes fraudulently represented that he was Johnson's counsel, the district court's failure to *sua sponte* reconsider the motion to amend and to serve Johnson with

a copy of its order do not amount to an abuse of the district court's considerable discretion.

V

We reverse the district court's grant of summary judgment as to Defendant-Appellees Ferrell, Lewis, and Marler and remand this case for further proceedings. We affirm the district court's denial of Johnson's motion to amend the complaint.

**AFFIRMED IN PART AND REVERSED IN PART.**