[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10825

Non-Argument Calendar

_____

LAWRENCE DEMPSEY,
as personal representative of the estate of
Nicole Dempsey deceased for the benefit
of her survivors and estate,

                                        Plaintiff-Appellee,

*versus*

SHERIFF, BAY COUNTY FLORIDA,
et al.,

                                        Defendants,

SHELLY WINTERS,
in her individual capacity

2                     Opinion of the Court                     23-10825

f.k.a. Shelly Ziegler,

TABITHA BURKES,

KATHRYN AYERS,

JILLIAN LESKO,

                                              Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:21-cv-00134-TKW-MJF

_____

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

This interlocutory appeal arises out of Nicole Dempsey's death due to endocarditis, a bacterial infection of the inner lining of the heart's chambers and valves, while being held as a pre-trial detainee at the Bay County Jail ("BCJ") in Panama City, Florida. Shelly Winters, Tabitha Burks, Kathryn Ayers, and Jillian Lesko (collectively the "Nurses"), seek review of the district court's order denying them qualified immunity at summary judgment for their medical treatment of Dempsey.  On appeal, the Nurses argue that (1) they were not deliberately indifferent to Dempsey's serious medical needs because they did not know that Dempsey had acute endocarditis; and (2) their medical treatment of Dempsey did not

violate clearly established law.  After careful review, we affirm in part and reverse in part.

## I.  Background

On April 18, 2019, Dempsey was arrested on outstanding warrants and brought to the BCJ.  During the booking process, Nurse Lesko, an advanced registered nurse practitioner ("ARNP"), conducted a medical evaluation and determined that Dempsey was likely suffering from sepsis.  The previous night, Dempsey, who had been hospitalized at the Gulf Coast Medical Center ("GCMC"), left the hospital against medical advice.  Because of Lesko's concerns, Dempsey was unable to be accepted into the BCJ and she was released into the custody of Emergency Medical Services ("EMS") who transported her back to GCMC.  The police declined to book her pursuant to the arrest warrants or to maintain custody over Dempsey while she was at GCMC.

After returning to GCMC, Dempsey was referred for a cardiology consultation.  The cardiologist noted that Dempsey appeared frail, confused, and chronically ill.  He determined that Dempsey was making decreased breathing sounds and had an abnormal skin color with lesions, but that her lower extremities did not show any signs of edema.  The cardiologist ultimately diagnosed Dempsey with endocarditis and sepsis.[1]  The

---

[1] As the district court emphasized, endocarditis is a life-threatening inflammation of the inner lining of the heart's chambers and valves which is caused by a bacterial infection.  This infection can damage or destroy the

cardiologist determined that Dempsey "[was] in a very tough spot" because she "[had] severe tricuspid regurgitation probably due to degeneration of the valve" resulting from her continual intravenous drug use and that it was "uncertain that [GCMC] could find a surgeon to operate on [Dempsey's] valve any further because it would likely be [a] replacement." He stated that Dempsey "[would] obviously need at least 6 weeks of antibiotics" but that "[h]er prognosis [was] very poor overall." Prior to Dempsey's cardiologist consultation, GCMC had already started her on three antibiotics—Vancomycin, Azithromycin, and Ceftriaxone. Following the cardiologist's diagnosis of endocarditis, GCMC continued to treat Dempsey with Vancomycin and Azithromycin.

On April 26, 2019, after being hospitalized at GCMC for eight days, medical personnel became concerned that Dempsey was using drugs in her bathroom. Hospital security discovered drug paraphernalia in Dempsey's purse and a doctor requested permission from Dempsey to have security search the remainder of her belongings. The doctor explained to Dempsey "that she could refuse to be searched, against medical advice, or she could consent to a search of her belongings to eliminate outside drugs that could harm or interfere with her care [at GCMC]." She refused the doctor's request and left GCMC for a second time against medical advice.

---

heart's valves. *See* Endocarditis, https://www.mayoclinic.org/diseases-conditions/endocarditis/symptomscauses/syc-20352576 (last visited Nov. 28, 2023).

23-10825                    Opinion of the Court                         5

A few hours after leaving GCMC, Dempsey overdosed on heroin and was found unresponsive in a parked van. Police conducted a warrant check on Dempsey, discovered her outstanding warrants, and followed EMS to the Bay Medical Beach Emergency Room ("Bay Medical"). Dempsey's doctor at Bay Medical gave her a physical examination and determined that her lungs did not show any signs of distress and that she had a regular heart rhythm. Her discharge paperwork from Bay Medical stated that she was treated for a heroin overdose with Narcan and "discharged to the remand of the police." The discharge paperwork noted that Dempsey's physician "[had] given [Dempsey] specifics regarding signs and symptoms of when to immediately return to the emergency department." These symptoms included "any recurrence of difficulty breathing, chest pain, shortness of breath, rashes or fevers, nausea or vomiting, abdominal pain, neck stiffness, mental status change or any other concerns."

After being discharged from Bay Medical, the police took Dempsey to BCJ where she was booked on the outstanding arrest warrants. Dempsey filled out an Intake Health Screening Form, where she noted that she had endocarditis and was being treated with Azithromycin and Coreg.[2] A Certified Medical Technician

---

[2] According to the Mayo Clinic, intravenous Azithromycin is an antibiotic that is used to treat bacterial infections in different parts of the body. *See* Azithromycin (Intravenous Route) https://www.mayoclinic.org/drugs-supplements/azithromycin-intravenous-route/description/drg-20062196.

(CMT), who is not a party to this case, also completed a Preliminary Medical Assessment Form which indicated that Dempsey had a history of cardiac issues and was suffering from endocarditis. This Preliminary Medical Assessment Form also stated that Dempsey was taking Azithromycin and Coreg. Dempsey signed a Request for Medical Records which authorized BCJ to obtain Dempsey's medical records from any healthcare facility. Nurse Burks, a licensed practical nurse ("LPN") assigned to Dempsey's dorm, reviewed Dempsey's intake health screening form on April 27, 2019.

On the evening of April 28, 2019, Dempsey complained to Nurses Burks and Dugosh of chest pains. Burks and Dugosh advised Dempsey that they would let Lesko know of her complaint.[3]

On the morning of April 29, 2019, Nurse Ayers, another LPN, examined Dempsey and took her vitals, noting that Dempsey had a blood pressure reading of 138/88, which was high.[4] All

---

Coreg is a beta-blocker that is used to treat high blood pressure and reduce the risk of heart attacks. *See* Carvedilol (Brand Name Coreg) https://www.mayoclinic.org/drugs-supplements/carvedilol-oral-route/description/drg-20067565.

[3] Lesko, as the ARNP, worked under the supervision of a medical doctor at BCJ and was above the other nurses at the BCJ, but she did not directly supervise the other nurses. The medical doctor is not a party to this lawsuit.

[4] According to the American College of Cardiology, a normal blood pressure reading should show a top number below 120 and a bottom number below

23-10825               Opinion of the Court                    7

parties agree that Lesko subsequently examined Dempsey's medical records including her discharge paperwork from Bay Medical and at 12:48 P.M. ordered that (1) Dempsey be given Coreg to treat Dempsey's high blood pressure and (2) her vitals continue to be monitored. Less than two hours later, around 2:35 P.M., Dempsey complained again about having chest pains. At that time, while Ayers did not physically examine Dempsey, Ayers contacted Lesko and received the order for Coreg, noting that Dempsey was to be started on medication.

In the early morning hours of April 30, 2019, Dempsey submitted a sick call request which indicated her reason for asking to be seen was "Endocarditis [G]ulf Coast Hospital." Nurse Paramore, an LPN and a non-party to this case, responded to the request, examined Dempsey, and filled out a Chest Pain Form. Paramore noted on the Chest Pain Form that Dempsey had suffered pain on the left side of her chest all day; Dempsey's blood pressure was 162/114; Dempsey had been treated at GCMC beginning on April 18, 2019, but had left against medical advice; both of Dempsey's lungs were making a wheezing sound; Dempsey's hands were swollen; and Dempsey had pitting edema in both of her lower extremities. Paramore contacted Lesko who

---

80. A top number between 120 to 129 equates to elevated blood pressure. High blood pressure, also called hypertension, is indicated by a top number of 130 or above or a bottom number above 80. *See* Blood Pressure, https://www.cardiosmart.org/docs/default-source/assets/infographic/blood-pressure.pdf?sfvrsn=dfcd6c1_1 (last visited Nov. 28, 2023).

prescribed Dempsey with Albuterol, Lasix, Clonidine and ordered an electrocardiogram. Lesko also scheduled a follow-up with Dempsey for later that day.

At Dempsey's follow-up appointment with Lesko, Lesko noted that Dempsey had pitting edema in both of her lower extremities. She also identified that Dempsey had a history of endocarditis and left GCMC against medical advice only four days prior. Dempsey informed Lesko that she was being treated with antibiotics for her endocarditis while at GCMC, and Lesko made a note to check Dempsey's medical records. Despite this, Lesko did not prescribe antibiotics although she did order an x-ray for Dempsey which showed that Dempsey had left-lung airspace disease. Lesko left for a trip the following day and did not have any further personal interaction with Dempsey.

According to the sworn-declaration of Megan Scelfo, a detainee at BCJ and dormmate of Dempsey, on May 1 and 2, 2019, Dempsey complained to correctional officers that she was experiencing chest pain, had a difficult time breathing, and needed to be sent to the hospital to be treated for endocarditis. Scelfo stated that Dempsey's condition was visibly deteriorating and that Dempsey had lost control over her bowels and bladder, resulting in Dempsey defecating and urinating in her bed. Scelfo also declared that Dempsey felt hot to the touch, appeared disoriented, and began walking through the dormitory without any pants or shoes on. Scelfo asserted that the correctional officers relayed these concerns to medical personnel via radio, but that Dempsey was not

seen by medical personnel or sent to the hospital. Accordingly, Dempsey filled out a second sick call request on May 2, 2019, again indicating her endocarditis diagnosis and difficulty breathing. Nurse Winters, an LPN, responded to that request by stating that Dempsey "[had] been seen by ARNP [Lesko] for this already" and that Dempsey just needed to wait for the medication she had been prescribed to work. Earlier that morning, Winters had physically examined Dempsey and given her the drugs prescribed by Lesko.

By 8:40 A.M. on May 3, 2019, Dempsey's condition had deteriorated to such a state that the correctional officer reported to medical staff that Dempsey had been laying in her urine and feces all night. Ayers responded and noted that Dempsey's breathing was "rapid and labored" and that she appeared "very weak." Dempsey's blood pressure was 100/69 and she had a pulse of 120 beats per minute. Ayers called Lesko who instructed Ayers to take Dempsey to the medical unit in BCJ, hydrate her, treat her with Imodium, give her an electrocardiogram, and monitor her status. By 10:00 A.M., Nurse Smith, a registered nurse and non-party to this case, sent Dempsey to GCMC via ambulance.

Dempsey was admitted to GCMC and was diagnosed with endocarditis and septic shock. She was intubated and was treated with Vancomycin and Cefepime. Over the next two days, Dempsey's condition did not improve and her father "request[ed] comfort care only" because he "underst[ood] the poor prognosis and [did] not wish to prolong the inevitable." Dempsey was pronounced dead at 5:21 P.M. on May 5, 2019. Dempsey's official

cause of death was listed as endocarditis due to chronic drug use with HIV as a contributing factor.

On April 27, 2021, Dempsey's estate (hereinafter "the Estate") filed a wrongful death lawsuit in Florida state court predicated on 42 U.S.C. § 1983 and Florida's Wrongful Death Act, Fla. Stat. § 768.16, *et. seq.*, against Tommy Ford in his official capacity as the Sheriff of Bay County, Florida, alleging among other things that Ford's deliberate indifference to Dempsey's serious medical needs caused Dempsey's death. The Sheriff timely removed the complaint to the U.S. District Court for the Northern District of Florida based on federal question jurisdiction. The Estate amended the complaint to add deliberate indifference claims against Nurses Ayers, Burks, Dugosh, Lesko, and Winters. The operative Second Amended Complaint ("SAC") asserts six deliberate indifference claims under Section 1983, one claim each against the Sheriff and the five Nurses.

After extensive discovery, the Nurses and Sheriff filed motions for summary judgment, arguing that they were not deliberately indifferent to Dempsey's serious medical needs and that they were entitled to qualified immunity. The district court granted summary judgment in favor of Dugosh and the Sheriff, but held that Ayers, Burks, Lesko, and Winters were not entitled to summary judgment. In doing so, the district court determined that "a reasonable jury could find that the medical care provided by each of the Nurse Defendants except Dugosh was grossly inadequate, cursory, and/or unduly delayed." It concluded that

this inadequate care would constitute a deliberate indifference to Dempsey's serious medical needs and that the law was clearly established at the time of Dempsey's incarceration that the Nurses' treatment of Dempsey was unconstitutional. Accordingly, the district court determined that the Nurses were not entitled to the defense of qualified immunity at summary judgment. Ayers, Burks, Lesko, and Winters appeal the district court's denial of qualified immunity at summary judgment.[5]

## II.  Appellate Jurisdiction

"[A]s a court of limited jurisdiction, we are generally barred from entertaining appeals of non-final orders because we have no congressional grant to do so." *Hall v. Flournoy*, 975 F.3d 1269, 1274 (11th Cir. 2020). Under the collateral order doctrine, however, we may review "some determinations, including certain denials of qualified immunity. . . ." *Id.* "In particular, we may review the denial of a claim of qualified immunity to the extent that it turns on an issue of law." *Spencer v. Benison*, 5 F.4th 1222, 1229 (11th Cir. 2021) (quotation omitted). But "[w]e lack interlocutory jurisdiction where the only issues appealed are evidentiary sufficiency issues." *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023) (quotation omitted).

A district judge's determination on qualified immunity "involves a two-part analysis: (1) defining the official's conduct,

---

[5] The district court's granting of summary judgment in favor of the Sheriff and Dugosh is not before us.

based on the record and viewed most favorably to the non-moving party, and (2) determining whether a reasonable public official could have believed that the questioned conduct was lawful under clearly established law." *Koch v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000). "Our precedents establish [] only that a plaintiff may not base an interlocutory appeal on the district court's first determination *by itself*." *English*, 75 F.4th at 1155–56 (brackets and italics in original) (quotation omitted). When, as here, "*both* core qualified immunity issues are involved, we have jurisdiction for *de novo* review[.]" *Id.* at 1156 (brackets and italics in original) (quotation omitted).

### III.    Discussion

The Nurses argue that the district court erred in denying them qualified immunity for a variety of reasons, each of which will be addressed below. To overcome each Nurse's invocation of the defense of qualified immunity, the Estate must show that (1) the Nurse individually violated one of Dempsey's constitutional rights and (2) that the right was "clearly established" at the time of Nurse's purported misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We proceed by first assessing whether the facts viewed in the light most favorable to the Estate could lead a reasonable juror to determine that Ayers, Burks, Lesko, and Winters each violated Dempsey's constitutional right to receive adequate care for her serious medical needs. After concluding that a reasonable juror could make such a determination with respect to Burks, Lesko, and Winters, we move to the second prong of qualified immunity and conclude that Dempsey's constitutional right was

clearly established at the time of their actions. Accordingly, we affirm the district court's denial of qualified immunity to Burks, Lesko, and Winters at summary judgment. With respect to Ayers, however, there is no evidence from which a reasonable juror could conclude that she was subjectively aware that Dempsey had endocarditis. Thus, a reasonable juror could not conclude that Ayers violated Dempsey's constitutional rights and therefore Ayers is entitled to qualified immunity. Accordingly, we reverse the district court's denial of summary judgment as to Ayers.

### A. Deliberate Indifference of Dempsey's Serious Medical Needs

"The Fourteenth Amendment requires government officials to provide basic necessities, including medical care, to pretrial detainees." *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022). The minimum standard of medical care allowed by the due process clause of the Fourteenth Amendment "is the same as that allowed by the [E]ighth [A]mendment for convicted persons." *Hamm v. DeKalb Cnty.*, 774 F.2d 1576, 1574 (11th Cir. 1985). The Supreme Court has held that because the Eighth Amendment to the U.S. Constitution prohibits "the unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)), it also prohibits "deliberate indifference to serious medical needs of prisoners." *Id.* Thus, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 105.

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both

an objective and a subjective inquiry." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). "A plaintiff must show that (1) he suffered from an 'objectively serious medical need' and (2) a prison official acted with subjective deliberate indifference to that medical need." *Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023) (quoting *Hoffer*, 973 F.3d at 1270). Additionally, "as with any tort claim, [a plaintiff] must show that the injury was caused by the defendant's wrongful conduct." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "As to step one (the objective component), a medical need that is objectively serious 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Johnson*, 83 F.4th at 1327 (quoting *Goebert*, 510 F.3d at 1326). "As to step two (the subjective component), a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than gross negligence." *Id.*

The deliberate indifference standard "is far more onerous than normal tort-based standards of conduct sounding in negligence" and "medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271 (internal quotations omitted). This standard requires a plaintiff to show that a defendant "had a sufficiently culpable state of mind which is the equivalent of recklessly disregarding a substantial risk of serious

harm to the inmate." *Ireland*, 53 F.4th at 1288 n.5 (quotation omitted). Furthermore, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours[.]" *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). While this bar is certainly high, it is not insurmountable. *Johnson*, 83 F.4th at 1330. We begin our deliberate indifference analysis by first addressing the objective component before moving onto the subjective component for each Nurse.[6]

The Nurses concede for purposes of the objective component that endocarditis is a serious medical condition. However, they argue that the Estate failed to and cannot establish that Dempsey "was suffering from acute endocarditis from April 26, 2019, through May 3, 2019." This argument is without merit. The Estate has provided ample evidence that could lead a reasonable juror to conclude that Dempsey was suffering from endocarditis while she was held as a pre-trial detainee at BCJ on the

---

[6] In the proceedings below, the Nurses did not challenge causation and instead argued only that the Estate could not satisfy the objective or subjective components of a deliberate indifference claim. On appeal, the Nurses argue that their actions did not cause Dempsey's death and that they are entitled to summary judgment. Because the Nurses did not argue a lack of causation below, we do not address it here. *See Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000) ("Arguments raised for the first time on appeal are not properly before this Court."). As the district court noted, the Estate will need to prove all elements of a deliberate indifference claim, including causation, to prevail at trial.

dates in question. This evidence includes hospital records showing (1) Dempsey was being treated for endocarditis at GCMC from April 18, 2019, until April 26, 2019, when she left the hospital against medical advice; and (2) she died of endocarditis on May 5, 2019, two days after being transported by ambulance from BCJ back to GCMC. Additionally, evidence shows that Dempsey was displaying symptoms of endocarditis—including chest pains, pitting edema, and high blood pressure—and informed medical staff at BCJ at least three times that she had endocarditis. This is enough evidence that a reasonable juror could determine that Dempsey had an active endocarditis infection while being held as a pre-trial detainee at BCJ. Accordingly, the district court did not err in determining the Estate had met its burden of providing evidence "to establish the objective element of [its] deliberate indifferen[ce] claims."[7] We now address the subjective component for each individual nurse.

---

[7] The Nurses also argue that (1) the district court improperly relied on Dempsey's discharge paperwork from BCJ, which instructed Dempsey to return to the emergency room if she experienced difficulty breathing, chest pain, or shortness of breath, because the discharge paperwork was given under the assumption that Dempsey was returning home and not going to jail where she would have medical care; and (2) there is no evidence that shows the Nurses would be on notice that Dempsey had endocarditis or any serious medical need until May 3, 2019, when she was taken to GCMC via ambulance The former argument fails because the BCJ discharge paperwork explicitly stated that Dempsey was to be "discharged to the remand of the police." The latter argument conflates the subjective prong of a deliberate indifference

The district court determined that there was evidence "from which a reasonable jury could find that, at different points between April 27 and May 3, Burks, Lesko, Winters, and Ayers each subjectively knew that Ms. Dempsey had a serious medical condition that needed emergency care." The district court also concluded that there was sufficient evidence "from which a reasonable jury could find that the medical care provided by each of the Nurse Defendants . . . was grossly inadequate, cursory, and/or unduly delayed." More specifically, the district court determined that there was evidence that Burks, Lesko, Winters, and Ayers each knew of Dempsey's endocarditis diagnosis; knew of her symptoms consistent with that diagnosis; in some instances, failed to physically examine Dempsey despite her repeated complaints; and instead of sending Dempsey to emergency care or treating her with antibiotics, the Nurses merely treated Dempsey's symptoms without addressing the root cause.

On appeal, the Nurses argue that the district court failed to apply the "more than mere negligence" standard and that their conduct did not amount to "subjective recklessness as used in criminal law" which is what they assert is required for a deliberate

---

claim with the objective prong and as discussed later in this opinion, fails in any event.

indifference claim.[8]  They assert that the care they provided to Dempsey—treating Dempsey's symptoms with medication, ordering an x-ray and an echocardiogram, and continually monitoring her vitals—proves they were not deliberately indifferent to Dempsey's needs. [9]  The Nurses also point to Dempsey's physical demeanor as proof that they had no reason to believe that Dempsey was suffering from a serious medical condition because she was not showing signs of distress.[10]  Instead,

---

[8] Panels of our Court have applied two different standards in evaluating deliberate indifference claims.  Some panels have applied a "more than mere negligence" standard while others have applied a "more than gross negligence standard" which equates to a reckless disregard.  *Wade v. McDade*, 67 F.4th 1363, 1371–72 (11th Cir. 2023) (collecting cases), *reh'g en banc granted, opinion vacated sub nom.* No. 21-14275, 2023 WL 6613842 (11th Cir. Oct. 11, 2023).  We need not determine the proper standard in the present case because a reasonable juror could determine that the actions of Burks, Lesko, and Winters satisfied the more demanding "more than gross negligence" standard.

[9] The Nurses argue that they believed Dempsey's symptoms were consistent with heroin withdrawal and were therefore not related to acute endocarditis. Thus, they assert they were treating Dempsey for withdrawal.  However, at summary judgment we must view the facts in the light most favorable to the Dempsey as the nonmoving party.  When viewed in this light, Dempsey's symptoms support an inference that Burks, Lesko, and Winters each subjectively knew of Dempsey's endocarditis infection.

[10] In making this argument, the Nurses argue that in accordance with *Scott v. Harris*, 550 U.S. 372 (2007), the district court improperly considered Scelfo's sworn statement regarding Dempsey's physical condition because video evidence supports the Nurses' position that Dempsey was not in physical distress.  In *Scott*, the Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

they assert that the district court improperly applied a 20/20 hindsight standard in determining whether the Nurses had the subjective knowledge required for the Estate to prevail on its deliberate indifference claims. The Estate, in turn, argues that the district court properly determined that there was sufficient evidence from which a reasonable juror could conclude that each of the Nurses subjectively knew about Dempsey's serious medical needs and were deliberately indifferent to those needs by either delaying treatment, providing grossly inadequate care, taking an easier but less efficacious court of treatment, or providing utterly cursory medical treatment.

Upon review, we agree with the Estate in part. As we explain below, the district court was correct in holding that there was sufficient evidence from which a reasonable juror could conclude that Burks, Lesko, and Winters were subjectively aware of Dempsey's endocarditis infection and that each failed to provide

---

that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." 550 U.S. at 380. As we recently noted, however, *Scott* "applies only when the video actually proves that the plaintiff's version of the facts cannot be true." *Brooks v. Miller*, 78 F.4th 1267, 1271. Nothing in the May 2, 2019, videos—which in total is only a little more than seven minutes of video footage—disproves Scelfo's sworn statement that Dempsey felt hot to the touch, defecated and urinated in her bed, complained to staff about chest pains, and was behaving oddly on the nights of May 1 and 2, 2019. Accordingly, the district court did not err in considering Scelfo's sworn statement in ruling on the motions for summary judgment.

the adequate level of care.  We disagree with the district court, however, as to Ayers.

We turn first to the evidence supporting the inference that each Nurse had the subjective knowledge that Dempsey was suffering from a serious medical condition.  With respect to Burks, there is evidence that she knew as early as April 27, 2019—when she reviewed Dempsey's intake paperwork—that Dempsey had endocarditis and was being treated with Azithromycin.  Likewise, Lesko's notes from her examination of Dempsey on April 30, 2019—which stated Dempsey had a history of endocarditis and intravenous heroin use, had pitting edemas in both lower extremities, and had left GCMC against medical advice only four days prior—support a reasonable inference that she was aware Dempsey was being treated for an endocarditis infection as recently as April 26, 2019.  As to Winters, she responded to Dempsey's second sick call request, which stated Dempsey was having trouble breathing and had endocarditis.  Combined with Winters's response that Dempsey had already been seen and just needed to let the medication work, it is reasonable to infer that Winters knew on May 2, 2019, about Dempsey's endocarditis.  Thus, the district court did not err in concluding that the material facts of this case, construed in the light most favorable to the Estate, could lead a reasonable juror to conclude "that [Burks, Lesko, and Winters] knew at different points that [Dempsey] had endocarditis[.]"

With respect to Ayers, however, a reasonable juror could not conclude that she was subjectively aware of Dempsey's endocarditis infection. Ayers only had two interactions with Dempsey.  On the morning of April 29, 2019, Ayers examined Dempsey and took her vitals.  After Dempsey complained about chest pains for the second time in the afternoon of April 29, Ayers contacted Lesko who confirmed she had ordered that Dempsey be treated with Coreg.  Nothing in these April 29 interactions indicated to Ayers that Dempsey was suffering from a serious medical condition, let alone endocarditis.  And while Ayers may have learned on the morning of May 3, 2019, that Dempsey was suffering from a serious medical condition—evidenced by the fact that Dempsey (1) had rapid and labored breathing; (2) a high pulse rate (3) had been laying in her feces and urine all night; and (4) required a correctional officer's assistance to shower—there is no evidence indicating she knew this condition was endocarditis. Accordingly, the care Ayers provided on May 3—calling Lesko and following orders to take Dempsey to the medical unit for further evaluation and treatment—was not so grossly inadequate as to constitute a reckless disregard of the substantial risk of serious harm to Dempsey.

With it established that there is sufficient evidence for a reasonable juror to conclude that each of the Nurses (except for Ayers) subjectively knew that Dempsey had endocarditis, we next assess whether a reasonable juror could conclude that their medical care constituted a reckless disregard of a substantial risk to Dempsey's health.  We hold that a reasonable juror could reach

this conclusion with respect to Burks, Lesko, and Winters. For starters, the evidence shows that none of these three sent Dempsey to the hospital before May 3, 2019, despite the fact that endocarditis requires treatment of intravenous antibiotics which the jail could not administer. Lesko failed to prescribe any antibiotics, nor did she contact the prison doctor at any point to discuss Dempsey's complaint of endocarditis. Instead of taking Dempsey's complaints of endocarditis seriously, Lesko merely prescribed medication that addressed Dempsey's symptoms of high blood pressure, difficulty breathing, and pitting edema, not the root cause of these symptoms. Similarly, on May 2, 2019—when Dempsey complained about difficulty breathing and endocarditis—Winters merely responded that Dempsey needed to wait for the non-antibiotic drugs that Lesko had prescribed to work. Likewise, on the night of April 28 when Burks responded to Dempsey's complaints of chest pains, Burks merely placed Dempsey back in the dorm and informed her that she would contact Lesko, even though Burks was already aware of the fact that Dempsey had endocarditis and had recently been treated with Azithromycin. Burks and Winters continued with the cursory treatment that Lesko prescribed and ignored the root cause of Dempsey's complaints. Given the severity of endocarditis and Dempsey's continual complaints and deteriorating condition over the days she was held as a pretrial detainee at BCJ, we conclude that a reasonable juror could conclude that Burks, Lesko, and Winters recklessly disregarded the risk to Dempsey's healthy by not

ensuring she received the intravenous antibiotics required to treat endocarditis.[11]

### B. Dempsey's Right Was Clearly Established

Our determination that a reasonable juror could determine that Burks, Lesko, and Winters were deliberately indifferent to Dempsey's serious medical needs does not end our inquiry. We must also determine whether binding precedent clearly established, at the time of Dempsey's detention, that Burks, Lesko, and Winters were required to ensure that Dempsey's endocarditis was treated. We hold that the law was clearly established at the time of Dempsey's detainment at BCJ.

For a law to be clearly established, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what [the] defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020) (quotation omitted). In undertaking this analysis, we must be careful "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). However, "there need not be a case 'on all fours' with materially identical facts, before we allow suits against

---

[11] As discussed above, there is no evidence that Ayers was subjectively aware that Dempsey had endocarditis. While she may have been aware on May 3, 2019, that Dempsey had a serious medical condition, Ayers's treatment of this condition—taking Dempsey to BCJ's medical unit for further care—does not constitute a reckless disregard to Dempsey's health.

[government officials]." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004). Accordingly, a plaintiff can satisfy the clearly established requirement in one of three ways. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022). First, a plaintiff can "point[] to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose." *Id.* Second, a plaintiff can "establish[] that a broader clearly established principle should control the novel facts of the case." *Id.* (internal quotations omitted). Finally, a plaintiff can "convinc[e] us that the case is one of those rare ones that fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Id.* (second brackets in original) (internal quotations omitted).

Burks, Lesko, and Winters argue that the district court erred in concluding that the law was clearly established that their actions violated Dempsey's constitutional right to adequate medical care. They assert that the district court improperly relied on our decision in *McElligott v. Foley* in coming to its decision because the factual situation in the instant matter is not substantially similar to the facts present in that case. We disagree. In *McElligott*, we considered whether a doctor and nurse were deliberately indifferent to a prisoner's serious medical needs when, over the course of a period of six months, they continually ignored his complaints of severe abdominal pain and merely treated him with Tylenol and Pepto-Bismol. 182 F.3d at 1252–53. After the prisoner was finally sent to the hospital, the prisoner was diagnosed with terminal stomach cancer. *Id.* at 1254. We held that a reasonable jury could determine

that the nurse and doctor were deliberately indifferent to the prisoner's serious medical condition because (1) instead of attempting to diagnose and treat his worsening condition, they took an easier and less efficacious course of treatment; and (2) the medication they prescribed did not address the prisoner's severe pain he was experiencing as evidenced by his continual complaints and thus the care provided by the doctor and nurse was so cursory as to amount to no care at all.[12]  *Id.* at 1257–58.

There are certainly some factual differences between the situation in *McElligott* and the instant case, the most obvious being the fact that the prisoner in *McElligott* suffered for a period of months and Dempsey was only in the care of BCJ for eight days. However, unlike the medical staff in *McElligott* who did not know that the prisoner had cancer, here the evidence could lead a jury to conclude that Burks, Lesko, and Winters each individually knew that Dempsey had endocarditis which is a serious condition requiring treatment with intravenous antibiotics.  Lesko failed to prescribe such antibiotics to Dempsey and only prescribed drugs to address some of her symptoms, even as her condition worsened.

---

[12] We reached a similar conclusion in *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988).   In *Carswell*, the medical staff diagnosed and provided some medication to a prisoner who made continual requests for additional medical care.  Nevertheless, we affirmed a jury verdict in favor of the prisoner because as his condition continued to worsen, the medical staff failed to respond.  *Id.* at 457.  *See also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985) (holding that medical providers' delay in in providing necessary medical treatment to a prisoner who was later diagnosed and died from leukemia constituted deliberate indifference).

Burks and Winters knew that Dempsey was not being treated with antibiotics and they failed to take any action to address Dempsey's endocarditis.  This amounts to care that is so cursory as to amount to no care at all.  Thus, the law was clearly established at the time of Dempsey's detainment at BCJ that Burks's, Lesko's, and Winters's medical treatment of Dempsey was constitutionally deficient.

Accordingly, for the above reasons, the district court did not err in denying Burks, Lesko, and Winters qualified immunity at summary judgment.  The district did err in denying summary judgment to Ayers.

**AFFIRMED IN PART AND REVERSED IN PART**.